STATE OF NORTH CAROLINA v. BERNARDINO ZUNIGA

No. 2A84

(Filed 6 November 1984)

**1. Searches and Seizures § 7— search incident to lawful arrest**

　　A search without a search warrant may be made incident to a lawful arrest. In the course of such a search, the officer may lawfully take from the person arrested any property which such person has about him and which is connected with the crime charged, including the contents of handbags or wallets.

**2. Arrest and Bail § 3.1— warrantless arrest—necessity for probable cause**

　　To be lawful, a warrantless arrest must be supported by probable cause.

**3. Arrest and Bail § 3— time of defendant's arrest**

　　Although an officer stated that defendant was not placed under arrest while he was in Tennessee and that defendant was just being formally detained, defendant was, in effect, placed under arrest when he was escorted from the Knoxville bus station to the Knoxville Police Department where the officer admitted that he "would not have let [the defendant] go."

**4. Arrest and Bail § 3.1— probable cause for arrest—bulletins from other officers**

　　One law enforcement officer may rely upon bulletins from other officers as the basis for an arrest, but only so long as the originating officer himself has probable cause.

**5. Arrest and Bail § 3.1— requisites of probable cause**

　　Probable cause is a flexible, common-sense standard. It does not demand any showing that such a belief be correct or more likely true than false; rather, a practical, nontechnical probability is all that is required.

**6. Searches and Seizures § 8— search incident to arrest—probable cause for arrest in Tennessee—knowledge by North Carolina officers**

North Carolina law enforcement officials had probable cause to believe that defendant had committed the felonies of rape and murder of a seven-year-old child, and the warrantless search of defendant while he was detained in Knoxville, Tennessee at the request of North Carolina authorities was proper as being incident to defendant's lawful arrest by Tennessee officers pursuant to information received from North Carolina authorities, where the crimes occurred on a farm in a small, rural community, and where North Carolina officers knew that the victim's grandfather had seen defendant, who had previously been employed on the farm, going toward the farm in a taxicab on the morning of the crimes, that the taxicab driver had identified defendant as the person he had taken to the farm that morning, and that defendant had fled on a bus destined for Arkansas a few hours after the crimes.

**7. Arrest and Bail § 3.1; Searches and Seizures § 8— probable cause for arrest— consideration of flight to evade arrest**

Flight to evade arrest is a strong idicia of *mens rea,* and when coupled with other relevant facts or the specific knowledge on the part of the arresting officer relating the suspect to the evidence of the crime, flight may properly be considered in assessing probable cause.

Justice EXUM dissents.

THE State appeals pursuant to N.C.G.S. § 15A-979(c) from an order suppressing evidence to be offered by the State entered by *Judge Smith* at the 15 August 1983 Criminal Session of Superior Court, DAVIDSON County. Heard in the Supreme Court 11 September 1984.

*Rufus L. Edmisten, Attorney General, by Harry H. Harkins, Jr., Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, and Robin E. Hudson, Assistant Appellate Defender, for defendant-appellee.*

MEYER, Justice.

At approximately 2:00 p.m. on the afternoon of 13 July 1982, 7-year-old April Lee Sweet was reported missing. Her body was discovered later that afternoon on the Calvin Johnson farm near Taylorsville in rural Alexander County. The victim had been stabbed, her throat had been cut, and, as was later confirmed by autopsy, she had been raped.

As a result of investigation conducted during the afternoon and evening of 13 July, law enforcement authorities determined the following:

State v. Zuniga

On the morning of 13 July the victim's grandfather, Calvin Johnson, saw the defendant, whom he had known as Richard Lopez, traveling by taxicab toward the Johnson home. Mr. Johnson had previously employed the defendant as a farm worker. The cab driver took his passenger to the Johnson home and let him out at the house. It was further learned that later that day a Mexican male took a taxicab from Taylorsville to Statesville where he caught a bus destined for Pine Bluff, Arkansas. The passenger was identified as the defendant, Bernardino Zuniga, by means of a check which he had cashed with the driver of the taxicab. Based on the information given by these witnesses, law enforcement authorities determined that the prime suspect in the murder of April Sweet was the defendant, Bernardino Zuniga, also known as Richard Lopez—a Mexican male, approximately five feet nine inches in height, weighing approximately 155 pounds; that he had a mustache; and that when last seen he was wearing blue jeans, a blue-grey shirt, and possibly a ball cap. Law enforcement authorities were also aware that the suspect had fled the area and that in a matter of hours, the bus in which he was riding which was destined for Arkansas would arrive for a scheduled stop in Knoxville, Tennessee. Thus, this information was relayed to law enforcement authorities in Knoxville, Tennessee first by telephone and then over the Police Information Network.

In response to the request of North Carolina law enforcement authorities that defendant be held "for investigative purposes and for interview," Knoxville police, after conferring by telephone with the North Carolina authorities, met the bus in which defendant was believed to be riding. Defendant, the only Mexican male aboard the bus, was detained. Although defendant was wearing tan colored pants when he arrived in Knoxville, he was carrying a pair of wet blue jeans in a rolled-up paper bag. Defendant was taken to the Knoxville Police Department where he was placed in custody awaiting the arrival of North Carolina law enforcement authorities. During this time, the Knoxville police seized certain items of an incriminating nature, including a photograph of the victim found in defendant's wallet and a pair of bloodstained undershorts. After waiving extradiction, defendant was returned to North Carolina on 14 July 1982 at which time an arrest warrant was issued for the murder of April Lee Sweet. On 19 July

1982, an arrest warrant was issued against the defendant for the first-degree rape of April Lee Sweet.

Prior to trial the defendant moved to suppress all evidence "seized or taken from the defendant upon his being taken into custody by law enforcement officers on or about July 13, 1982 in Knoxville, Tennessee," on the ground that at the time defendant was taken into custody, there was no probable cause to believe that defendant had committed the crime for which he was later charged. At the conclusion of the suppression hearing, the trial judge made the following pertinent findings of fact:

(1) That on the morning of the 13th day of July, 1982, the defendant was observed by Calvin Johnson, the grandfather of April Lee Sweet, in the vicinity of the home of Calvin Johnson while proceeding towards the home of Calvin Johnson by way of a taxicab.

(2) That later, April Lee Sweet was found to be missing and in the late afternoon her body was discovered, which said body appeared to the officers to have been stabbed and raped.

(3) That Calvin Johnson knew the defendant by the name of Richard Lopez and had several years prior to 1982 employed the defendant.

(4) That a taxicab took a man to the home of Calvin Johnson on the morning of the 13th day of July, 1982.

(5) That the defendant or someone with the same general description, had on the 13th day of July, taken a bus from Statesville, North Carolina, to Pine Bluff, Arkansas, which was scheduled to arrive in Knoxville, Tennessee, at approximately 10:45 p.m. on said date.

(6) That the foregoing information was known to State Bureau of Investigation Agent Lester and Detective Hayden Bentley of the Alexander County Sheriff's Department, and the same was communicated by telephone, and the Police Information Network to Detective Moyers of the Knoxville Police Department along with a request that assistance be rendered in detaining a Mexican male who was on the heretofore referred to bus for interview and investigation.

(7) That Detective Moyers and the other officers of the Knoxville Police Department met the said bus and the defendant was the only person on said bus who appeared to be of Mexican origin, and who met the physical description previously furnished to them. The clothing being worn by the defendant was not as had been described.

(8) That upon encountering the defendant, Detective Moyers, felt or looked through the bag or package that was in the defendant's possession and found a pair of jeans, wet or damp, which he had been informed might be part of the clothing of the person under investigation.

(9) That Detective Moyers did not formally arrest the defendant but he did take him into custody and would not have allowed the defendant to leave had the defendant desired or attempted to do so.

(10) That at the time that Detective Moyers took the defendant into custody, he believed that the North Carolina authorities had probable cause to obtain a warrant charging the defendant with rape and murder.

(11) That at the time that Detective Moyers took the defendant into custody, Detective Moyers believed that the defendant had probably committed the crimes in question.

(12) That the beliefs of Detective Moyers concerning probable cause were based on information furnished to him in good faith and which he relied upon in good faith.

(13) That the defendant was transported to the Knoxville Police Department where head hair samples, fingernail scrapings, and pubic hair samples were obtained. His wallet was also taken at this time.

(14) That an interpreter was called because the defendant appeared to have difficulty understanding the Knoxville police officers even though he had informed them at the bus station that he understood the English language.

(15) That the defendant had been apprised of his rights in accordance with, *Miranda v. Arizona*, at the bus station and furnished a copy of those rights in order that he might

read and sign them and he did appear to, in fact, read the said rights.

(16) That at the time of taking the pubic hair samples Detective Moyers observed that the defendant pulled his trousers and undershorts down together and also used the same method in pulling up his trousers.

(17) That the defendant was placed in jail because of other matters within the duties of the Knoxville police officers, and because of the time needed for the North Carolina officers to arrive in Knoxville, Tennessee.

(18) That Detective Moyers, upon reflection, became concerned about the manner in which the defendant had removed and replaced his trousers during the obtaining of the pubic hair samples and he went to the jail for further investigation. At this further investigation, it was discovered that the defendant's undershorts had a large spot or spots of blood thereon.

(19) That the North Carolina officers arrived at the Knoxville Police Department in the early morning hours of July 14, 1982.

(20) That the defendant's wallet containing a picture of April Lee Sweet and the condition of the defendant's undershorts were made known to the North Carolina officer by Detective Moyers.

(21) That through an interpreter that arrived the defendant was again advised of his rights in accordance with, *Miranda v. Arizona*, and he refused to sign a waiver thereof without an attorney present, but then immediately stated he would sign the waiver and return to North Carolina.

\* \* \*

Based on the foregoing findings the trial judge made conclusions of law which included the following:

(1) That in the late afternoon of July 13, 1982, the law enforcement officers of the State of North Carolina and more particularly, the State Bureau of Investigation, Agent Lester and Detective Hayden Bentley of the Alexander County

Sheriff's Department, had probable cause to believe that a felony had been committed, the same being murder and rape.

(2) That at the time of the communications between the North Carolina law enforcement officers and Detective Moyers of the Knoxville Police Department, the North Carolina officers did not have probable cause to believe that the defendant was the perpetrator of those crimes heretofore mentioned.

(3) Though mistaken, Detective Moyers was of the opinion that the North Carolina officials had probable cause and believed that the defendant was the perpetrator of the murder and rape and he himself believed that the defendant probably committed those crimes.

(4) That the detention of the defendant in Knoxville, Tennessee, from the late evening hours of July 13, 1982, until the early morning hours of July 14, 1982, was without a warrant of arrest or probable cause.

(5) That, though the officer's actions were in good faith and reasonable as set forth in *The United States v. Williams*, 622 F. Supp. 830, "the good faith exception" is not presently the law of the United States or of North Carolina. It is a decision of application only to the Fifth Circuit of the United States.

\*     \*     \*

(7) That, though the defendant's return to the State of North Carolina did not comply with the statutes of the State of Tennessee concerning extradition, the defendant freely, understandingly and voluntarily waived the provisions of those statutes by agreeing to return to the State of North Carolina voluntarily, without threat or reward or hope of reward other than the officer's statement, if he refused, legal process would be obtained.

(8) That the statements of the officers in that regard were merely a statement of the legal proceedings that would be instigated, i.e., extradition, and they had probable cause at that time to believe that the defendant was the perpetrator

of a rape and murder, probable cause having existed from the time Detective Moyer observed the defendant's undershorts.

The trial judge therefore ordered "[t]hat any evidence obtained as a result of the defendant's detention without probable cause in the State of Tennessee be and the same is hereby ordered suppressed."

In its brief to this Court, the State presents three arguments in support of its position that the evidence obtained as the result of action taken by the Knoxville police should not be suppressed. The State first contends that the North Carolina officials had probable cause to believe that the defendant murdered and raped April Lee Sweet, and that even if the North Carolina officials lacked probable cause, the Knoxville police had probable cause to detain and search the defendant. Therefore, argues the State, the items in question were seized incident to a lawful arrest. Second, the State contends that in the absence of a finding of probable cause, the detention and search of the defendant was not an unreasonable search or seizure and therefore did not constitute a violation of defendant's fourth amendment rights. Third, in the event that we reject its first two contentions, the State urges us to recognize a good faith exception to the exclusionary rule and find that the Knoxville police acted on a good faith belief that North Carolina authorities had probable cause to arrest the defendant.

[1] A search without a search warrant may be made incident to a lawful arrest. *State v. Hardy*, 299 N.C. 445, 263 S.E. 2d 711 (1980); *State v. Harris*, 279 N.C. 307, 182 S.E. 2d 364 (1971); *State v. Roberts*, 276 N.C. 98, 171 S.E. 2d 440 (1970). In the course of such a search, the officer may lawfully take from the person arrested any property which such person has about him and which is connected with the crime charged. *State v. Roberts*, 276 N.C. 98, 171 S.E. 2d 440. Property includes the contents of handbags or wallets, *Illinois v. Lafayette*, --- U.S. ---, 77 L.Ed. 2d 65 (1983); *State v. Dickens*, 278 N.C. 537, 180 S.E. 2d 844 (1971); *State v. Ross*, 269 N.C. 739, 153 S.E. 2d 469 (1967). Therefore, if the search conducted by the Knoxville police was made pursuant to a warrantless, but lawful arrest, it did not exceed the permissible scope of a valid search incident to such an arrest.

The first, and what we consider to be the determinative issue in this case, is whether the North Carolina law enforcement officials had probable cause on 13 July to believe that the defendant had committed a felony and thus, whether the seizure of incriminating evidence while defendant was detained in Knoxville was the result of a search conducted pursuant to a lawful, although warrantless, arrest.

[2]   To be lawful, a warrantless arrest must be supported by probable cause. *Brinegar v. United States*, 338 U.S. 160, 93 L.Ed. 1879 (1949); *State v. Rinck*, 303 N.C. 551, 280 S.E. 2d 912 (1981); *State v. Joyner*, 301 N.C. 18, 269 S.E. 2d 125 (1980).

A warrantless arrest is based upon probable cause if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon. *McCray v. Illinois*, 386 U.S. 300, 18 L.Ed. 2d 62, 87 S.Ct. 1056 (1967). "Probable cause for an arrest has been defined to be a reasonable ground of suspicion supported by ′ circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. . . . To establish probable cause the evidence need not amount to proof of guilt, or even to prima facie evidence of guilt, but it must be such as would actuate a reasonable man acting in good faith." 5 Am. Jur. 2d, Arrest § 44 (1962); *State v. Harris*, 279 N.C. 307, 182 S.E. 2d 364 (1971).

*State v. Shore*, 285 N.C. 328, 335, 204 S.E. 2d 682, 686 (1974). *See also, State v. Joyner*, 301 N.C. at 21, 269 S.E. 2d at 128 and *State v. Rinck*, 303 N.C. 551, 280 S.E. 2d 912.

[3]   The evidence was conflicting as to the precise moment of defendant's arrest. The North Carolina officers who went to Tennessee testified that they did not believe that they had the authority to arrest the defendant in Tennessee and that Officer Moyers of the Knoxville Police Department arrested defendant in their presence. However, Officer Moyers testified that he did not formally arrest the defendant. It appears that defendant was not "formally" arrested until his return to North Carolina on 14 July.

An officer's testimony that the defendant was or was not under arrest is not conclusive. *State v. Sanders*, 295 N.C. 361, 245

S.E. 2d 674 (1978), *cert. denied*, 454 U.S. 973, 70 L.Ed. 2d 392 (1981); *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269 (1967). A "formal" declaration of arrest by an officer is not a prerequisite to the making of an arrest. *State v. Sanders*, 295 N.C. 361, 245 S.E. 2d 674; *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269; *see* 5 Am. Jur. 2d, Arrest § 1.

We have held that "[w]hen a law enforcement officer, by word or actions, indicates that an individual must remain in the officer's presence or come to the police station against his will, the person is for all practical purposes under arrest if there is a substantial imposition of the officer's will over the person's liberty." *State v. Sanders*, 295 N.C. at 376, 245 S.E. 2d at 684.

In the present case, although Officer Moyers stated that the defendant was not placed under arrest while in Tennessee, that he was "just being formally detained" he readily admitted that he "would have not let [the defendant] go." We therefore hold that defendant was, for all practical purposes, under arrest no later than when he was escorted from the bus station to the Knoxville Police Department.

[4] It is well established that one law enforcement officer may rely upon bulletins from other officers as the basis for an arrest, but only so long as the originating officer himself had probable cause. *Whiteley v. Warden*, 401 U.S. 560, 28 L.Ed. 2d 306 (1971); *State v. Shore*, 285 N.C. 328, 204 S.E. 2d 682. Should we determine that probable cause existed for defendant's arrest by North Carolina authorities on 13 July when the defendant was detained at the bus station in Knoxville, the incriminating evidence seized while defendant was in Tennessee would be properly admissible as the result of a search conducted pursuant to a lawful, although warrantless arrest. *State v. Hardy*, 299 N.C. 445, 263 S.E. 2d 711; *State v. Harris*, 279 N.C. 307, 182 S.E. 2d 364; and *State v. Roberts*, 276 N.C. 98, 171 S.E. 2d 440. Therefore, we must determine whether the North Carolina authorities had probable cause to believe that the defendant had murdered and raped April Lee Sweet prior to his arrest by the Tennessee authorities in the late evening of 13 July.

As in every case involving a determination of probable cause, it is upon the particular facts and circumstances, and the particular offense, that we must focus for resolution of the issue.

And, in dealing with probable cause, "as the very name implies, we deal with probabilities." *Brinegar v. United States*, 338 U.S. at 175, 93 L.Ed. at 1890. While this Court has, on numerous occasions, repeated the legal standard against which we measure the facts of each probable cause determination, perhaps the most succinct and enlightened definition is provided in *Brinegar*.

> [P]robabilities . . . are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
>
> "The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt. . . ." [A]nd this "means less than evidence which would justify condemnation" or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke v. United States*, 7 Cranch 339, 348. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. . . .
>
> These long-prevailing standards seek to safeguard citizens from rash and unreasonable inferences with privacy and unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice. (Citations omitted.)

*Id.* at 175-76, 93 L.Ed. at 1890.

[5]  Probable cause is a flexible, common-sense standard. It does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability is all that is required. *See Texas v. Brown*, 460 U.S. 730, 75 L.Ed. 2d 502 (1983).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*United States v. Cortez*, 449 U.S. 411, 418, 66 L.Ed. 2d 621, 629 (1981).

> Thus, while a reviewing court must, of necessity view the action of the law enforcement officer in retrospect, our role is not to import to the officer what in our judgment, as legal technicians, might have been a prudent course of action; but rather our role is to determine whether the officer has acted as a man of reasonable caution who, in good faith and based upon practical consideration of everyday life, believed the suspect committed the crime for which he was later charged. *See State v. Mathis*, 295 N.C. 623, 247 S.E. 2d 919 (1978); *State v. Streeter*, 283 N.C. 203, 195 S.E. 2d 502 (1973); *State v. Alexander*, 279 N.C. 527, 184 S.E. 2d 274 (1971); *State v. Harris*, 279 N.C. 307, 182 S.E. 2d 364; *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269.

[6]  We find that the North Carolina law enforcement authorities in the present case so acted. In reaching this conclusion we have attached particular significance to the fact that the murder occurred in a small, rural community;[1] that defendant's presence near the Johnson home was noted by the victim's grandfather and the taxi driver; that he was identified; that suspicion almost immediately narrowed to the defendant; and finally, that defendant fled within hours of the crime.

---

1. We note that out of an abundance of caution, the able trial judge granted defendant's motion for a change of venue based on this fact.

It is undisputed that the victim, a 7-year-old child, was brutally murdered and raped on the afternoon of 13 July 1982. It was a serious offense—one which demanded the most diligent and immediate police response. By early evening law enforcement authorities had targeted the defendant as a prime suspect. Indeed, a fair reading of the transcript indicates that the defendant, known to the family of the victim as Richard Lopez, a farm worker who had been employed by Calvin Johnson, was the only suspect. The ease with which the authorities were able to trace the defendant's movements on the day in question is a clear indication that in this tightly-knit, sparsely populated community, any unusual and unexplained presence was noticed and questioned. While presence in the vicinity of a crime which occurs in a populated area may, indeed, be of little significance, it is axiomatic that presence in the vicinity of a crime which occurs in a sparsely populated area, where access is limited and monitored, takes on added significance. Thus, in this rural section of Alexander County, the defendant's unexplained presence at the Johnson home on the morning of the murder, coupled with the discovery of the brutal slaying of a member of the Johnson family a short time later, would quite naturally arouse a high degree of suspicion in a reasonable person.

[7] When the authorities sought out the defendant for questioning, they discovered that he had fled. He was on a bus destined for Arkansas. Flight to evade arrest is a strong indicia of *mens rea*, and when coupled with other relevant facts or the specific knowledge on the part of the arresting officer relating the suspect to the evidence of the crime, flight may properly be considered in assessing probable cause. *State v. Williams*, 32 N.C. App. 204, 231 S.E. 2d 282, *appeal dismissed*, 292 N.C. 470, 233 S.E. 2d 924 (1977); *United States v. Garcia*, 516 F. 2d 318 (9th Cir.), *cert. denied sub nom., Martinez-Lopez v. United States*, 423 U.S. 934, 46 L.Ed. 2d 265 (1975). Not only did defendant's precipitous departure from the scene effectively deprive authorities of an opportunity to conduct an investigation prior to questioning the defendant,[2] but, more importantly, it was a circumstance which,

2. Following defendant's return to North Carolina on 14 July, investigation into the crime continued. A newspaper or advertising circular bearing defendant's post office box number was found near the scene of the crime. The postmaster recalled that defendant had picked up his mail shortly after 10:00 a.m. on the morning of the

considered with facts already known, would have led a reasonable person to believe that defendant was the perpetrator of the crime.

We therefore hold that when defendant was taken into custody by the Knoxville authorities, North Carolina authorities had probable cause to believe that the defendant had murdered April Lee Sweet. The subsequent search of the defendant was incident to his lawful arrest. The trial judge erred in ordering that the evidence obtained as the result of this search be suppressed. The order suppressing such evidence is vacated and the case is remanded to the Superior Court, Davidson County for further proceedings not inconsistent with this opinion.

Vacated and remanded.

Justice EXUM dissents.

murder. The mail contained numerous advertising circulars. A neighbor who lived approximately a mile from the Johnson home recognized the defendant as a Mexican who at one time had worked for Calvin Johnson. She recalled seeing the defendant walking along the road in front of her house at approximately 11:30 a.m. on the day of the murder. At approximately noon on the day of the murder, defendant was picked up by the local postman and driven into Taylorsville.